An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-693

Filed 18 February 2026

Alamance County, No. 20CVS002215-000

ESTATE OF HENRY WYER, By and Through the Administrators of the Estate of BENITA WYER and LAMONT WYER, Plaintiffs,

v.

ALAMANCE REGIONAL MEDICAL CENTER, INC. d/b/a CONE HEALTH ALAMANCE REGIONAL MEDICAL CENTER, Defendant.

Appeal by plaintiffs from Order entered 30 January 2025 by Judge R. Stuart Albright in Alamance County Superior Court. Heard in the Court of Appeals 27 January 2026.

> *Kenneth M. Johnson, P.A., by Kya Johnson, for plaintiffs-appellants.*
>
> *Waldrep Wall Babcock & Bailey PLLC, by J. Dennis Bailey and Peyton M. Pawlik, for defendant-appellee.*

ARROWOOD, Judge.

The Estate of Henry Wyer, by and through Administrators Benita Wyer and Lamont Wyer ("plaintiffs"), appeal the Order of the Alamance County Superior Court granting the Motion for Summary Judgment in favor of Alamance Regional Medical Center ("defendant"), filed 30 January 2025. For the following reasons, we affirm.

## I. Background

This case arose after the death of Mr. Henry Wyer ("Mr. Wyer") on 18 June 2018 at defendant's facility. The record on appeal tends to show the following series of events, as narrated by the pleadings, Mr. Wyer's extensive medical records, and subsequent affidavits and depositions from the parties and their expert witnesses.

### A. Statement of Facts

Before his death in June 2018, Mr. Wyer was a 75-year-old man with extensive chronic health issues. His various ailments left him in need of ongoing medical attention. In addition to Paget's disease, Mr. Wyer suffered residual pain from a work injury and subsequent neck surgery, a UTI [urinary tract infection], an enlarged prostate with possible malignancy, and failure to thrive with ongoing weight loss and poor appetite. He required use of a cane and walker, an indwelling catheter, and a home health aide.

Throughout the spring of 2018, Mr. Wyer endured a series of hospitalizations. In March 2018, while hospitalized at Duke Medical Center, Mr. Wyer was recommended for transfer to a nursing home, but his daughter Benita Wyer ("Benita") chose to care for him at her home. Mr. Wyer returned to Duke in April 2018 after a possible stroke. He saw his physician at Duke in May 2018, who recorded that Mr. Wyer suffered frequent falls, and he was then admitted to Peak Resources in Alamance for 18 days before returning home. On 5 June, Mr. Wyer's home health

care aide service requested a referral from Duke Medical Center for hospice treatment, as his condition had further declined.

The Record contains a Medical Orders for Scope of Treatment form ("the MOST form") preceding his admission at defendant's facility, dated 11 May 2018, recording Mr. Wyer's wishes for attempted cardiopulmonary resuscitation ("CPR") and the full scope of medical interventions. The MOST form is not signed by Mr. Wyer, but is signed by Benita as Mr. Wyer's representative. It also leaves blank the required name and contact information of a physician. In her deposition, Benita conceded that she had nothing signed or executed by Mr. Wyer appointing her as his power of attorney or healthcare power of attorney.

Mr. Wyer arrived at defendant's facility on 13 June 2018, complaining that he had not had a bowel movement for two weeks. He was seen by admitting physician Dr. Sona Patel ("Dr. Patel") and admitted for severe constipation, ileus, and partial small bowel obstruction. Dr. Patel described him as "a 75 y.o. male with a known history of End-stage COPD [Chronic Obstructive Pulmonary Disease], cervical spondylitis, BPH [Benign Prostatic Hyperplasia] with chronic Foley indwelling catheter since March 2018, failure to thrive, history of pancreatic mass and history of PE [pulmonary embolism] . . . with complaints of abdominal pain and intractable nausea vomiting." Dr. Patel described his present status generally: "Patient has been overall declining according to the daughter and has been followed by home health was recommended patient undergo hospice eval given his overall failure to thrive and

decline in general health with severe malnutrition and weight loss . . . He has been bedbound for last several weeks." Dr. Patel also noted: "Patient is a full code this was discussed with patient's daughter and patient in the ER." Recording his neurological and psychological status, Dr. Patel confirmed that Mr. Wyer was weak but was "negative for sensory change, speech change and focal weakness" and "negative for depression and hallucinations" and "not nervous/anxious." Mr. Wyer was "alert and oriented." In ordering a palliative consultation due to his "overall decline," Dr. Patel confirmed that both Benita and Mr. Wyer understood his "very poor prognosis." Dr. Patel also noted, "CODE STATUS discussed once to be a full code."

Mr. Wyer's medical record provides extensive notes from Nurse Practitioner Megan Mason ("NP Mason"), who provided Mr. Wyer's palliative care consultation on 14 June 2018. NP Mason recorded that she "met with patient and daughter at bedside to discuss diagnosis, prognosis, GOC [goals of care], EOL [end-of-life] wishes, disposition and options." She recorded that Mr. Wyer said he did not want to "keep coming back and forth to the hospital." She recorded that Benita "wants to focus on 'keeping him comfortable and keeping him home'" to avoid future hospitalizations, that she wanted unnecessary medications to be discontinued, and that they discussed "transition to comfort approach with hospice on discharge where focus will be comfort, quality, and dignity." She recorded that both "[p]atient and daughter agree with this plan." She records that Mr. Wyer's code status was also discussed:

Educated on recommendation for DNR/DNI [Do Not

> Resuscitate/Do Not Intubate] with age, frailty, and multiple comorbidities. Daughter states "if he had a chance of surviving I would want this for him" but also understands this will likely be more harm than good to him at the end of his life. Explained resuscitation/life support not falling in line with hospice philosophy at home. She agrees with DNR/DNI and allowing him to die a natural death.

NP Mason further recorded: "DNR/DNI now after discussion with patient/daughter. Durable DNR placed in chart." Accordingly, Mr. Wyer's Code Status was altered to "DNR." His prognosis is here listed as "< 6 months: if not significantly less . . . Family opts for comfort." She recorded that Mr. Wyer was "alert and oriented to person, place, and time . . . He is cooperative. He appears ill." NP Mason wrote that her consultation with Mr. Wyer and Benita lasted 70 minutes.

On the following day, Mr. Wyer was communicative, "asking to eat" and "will speak when spoken to." Benita had further conversations with palliative care RN Karen Robertson ("RN Robertson") to discuss plans for hospice, "to initiate education regarding hospice services, philosophy and team approach to care with understanding voiced." RN Robertson noted at this time the "[s]igned DNR in place in patient's chart."

Mr. Wyer died four days later, on 18 June 2018. Sixteen individual diagnoses were recorded at his time of death:

> 1. Asystole
> 2. Severe constipation with ileus
> 3. Stomach dilation as well as esophageal dilation
> 4. History of pulmonary embolism

5. Sinus tachycardia
6. Decubitis ulcer stage II
7. Elevated liver functions secondary to history of hepatitis B
8. Severe caloric protein malnourished patient with cachexia
9. Chronic indwelling Foley with abnormal UA
10. End-stage COPD
11. Cervical spondylitis
12. BPH with chronic indwelling Foley catheter
13. History of pancreatic mass
14. Coronary artery disease
15. Paget's disease of the bone
16. Partial paralysis of . . . both lower extremities

Earlier on the day of his death, RN Robertson visited Mr. Wyer to discuss hospice care at home following discharge, noting that he was "alert, quietly interactive." She also spoke with Benita via telephone.

However, at 6:25 p.m. RN Monique Jacobs was informed that Mr. Wyer's monitor showed asystole, or complete heart stoppage, and upon entering his room, she observed him "with no breath sounds, no heart rate, and no blood pressure," a "small amount of vomit on his chin," and cold hands. Mr. Wyer was pronounced dead shortly thereafter, and his family was notified. Benita returned to the hospital and claimed, contrary to NP Mason's earlier notes, that "she never stated that she wanted her father to be DO NOT RESCUSCITATE." Dr. Shreyang Patel recorded Benita's claim in Mr. Wyer's records and reproduced in full NP Mason's notes from the 14 June meeting.

## B.    Procedural History

- 6 -

As his children, both Benita and Mr. Lamont Wyer ("Lamont") were qualified as administrators of Mr. Wyer's estate. They filed their initial complaint against defendant on 17 December 2020, alleging the negligent direction of an unauthorized Do Not Resuscitate instruction, the negligent carrying out of the allegedly unauthorized instruction, and breach of contract for alleged failure to comply with an earlier written agreement to resuscitate Mr. Wyer. After a hearing on 30 August 2021 in Alamance County Superior Court, the Honorable Kevin M. Bridges presiding, the trial court granted defendant's motion to dismiss the complaint. Plaintiffs' initial complaint had not established that an expert witness reviewed the medical care and asserted that it fell below the applicable standard of care, as required by Rule 9(j) of the North Carolina Rules of Civil Procedure. *Est. of Wyer by & through Wyer v. Alamance Reg'l Med. Ctr., Inc.*, 2022-NCCOA-940, ¶ 7, 287 N.C. App. 395 (2022).

Plaintiffs appealed to this Court, which filed its unpublished opinion on the matter on 29 December 2022. *Id.* We affirmed the dismissal of the breach of contract claim, as "North Carolina does not recognize breach of contract as a legal theory under which one can recover for medical malpractice." *Id.* at ¶ 22 (citing *Lackey v. Bressler*, 86 N.C. App. 486 (1987)). However, we vacated the trial court's Order with respect to the negligent malpractice claim, finding that the heightened pleading standard was not required. *Id.* at ¶ 24. Plaintiffs had alleged facts implicating the *res ipsa loquitur* doctrine, which can be invoked where "no proof of the cause of an

- 7 -

injury is available, the instrument involved in the injury is in the exclusive control of the defendant, and the injury is of a type that would not normally occur in the absence of negligence" and where the plaintiff has "in part, alleged facts from which a layperson could infer negligence by the defendant based on common knowledge and ordinary human experience." *Id*. at ¶ 16 (citations omitted).

Because plaintiffs had averred that the DNR order's origin was unknown but would have been under defendant's exclusive control, and because an unauthorized DNR generally would not have been placed in Mr. Wyer's records absent negligence, "the facts of the case justify application of the doctrine and the nature of the occurrence and the inference to be drawn supply the requisite degree of proof to carry the case to the jury without direct proof of negligence and thus expert review and certification." *Id*. at ¶ 17 (citations omitted) (cleaned up). Accordingly, plaintiffs proceeded with their suit.

Following discovery, affidavits, and depositions from both parties, defendant moved for summary judgment on 30 December 2024 on the grounds that no genuine issues of material fact existed, entitling defendant to judgment as a matter of law, because there is "no evidence of negligence by Defendant or that any such negligence proximately caused injury or damage to Plaintiffs." After a hearing held on 27 January 2025 in Alamance County Superior Court, the Honorable R. Stuart Albright presiding, the trial court in its subsequent Order granted summary

judgment, agreeing that there were no genuine issues of material fact after review of the pleadings, discovery, depositions, and affidavits.

## II.  Discussion

When a trial court grants summary judgment, this Court reviews that Order *de novo*. *Dallaire v. Bank of Am.*, 367 N.C. 363, 367 (2014) (citations omitted). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2013).  The movant is entitled to summary judgment when it establishes the absence of any triable issue "by proving that an element of the opposing party's claim is non-existent, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of his claim or cannot surmount an affirmative defense which would bar the claim." *Collingwood v. General Elec. Real Est. Equities, Inc.*, 324 N.C. 63, 66 (1989) (citations omitted).

After the movant meets this burden, the nonmovant must "produce a forecast of evidence demonstrating that the plaintiff will be able to make out at least a prima facie case at trial." *Id.* "The movant's papers are carefully scrutinized and those of the adverse party are indulgently regarded." *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (citations omitted, cleaned up). "All facts asserted by the [nonmoving] party are taken as true and . . . viewed in the light most favorable to that party." *Id.* However, the nonmoving party "may not rest upon the mere allegations or denials of his pleading,

but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." N.C.G.S. § 1A-1, Rule 56(e) (2013).

In considering a motion for summary judgment, the trial court's function "is strictly confined to determining whether genuine issues of material fact exist and does not extend to resolving such issues." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579 (2002). An issue of material fact is genuine if "supported by substantial evidence." *Dewitt v. Eveready Battery Co.*, 335 N.C. 672, 681 (2002). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and means "more than a scintilla or a permissible inference." *Thompson v. Wake Cty. Bd. Of Educ.*, 292 N.C. 406, 414 (1977) (quotes omitted).

## A.     Plaintiffs' *Res Ipsa Loquitur* Claim

"In a medical malpractice action, the plaintiff has the burden of showing (1) the applicable standard of care; (2) a breach of such standard of care by the defendant; (3) the injuries suffered by the plaintiff were proximately caused by such breach; and (4) the damages resulting to the plaintiff." *Purvis v. Moses Cone Mem'l Hosp. Sev. Corp.*, 175 N.C. App. 474, 477 (2006) (internal quotation marks and citation omitted). In a medical malpractice action, the plaintiff must demonstrate, through the testimony of a qualified expert, that the alleged treatment administered by the defendant provider was in negligent violation of the accepted standard of care. *Tripp v. Pate*, 49 N.C. App. 329, 332 (1980).

Alternately, North Carolina recognizes the doctrine of *res ipsa loquitur* in medical malpractice cases "where the facts or circumstances accompanying an injury by their very nature raise a presumption of negligence on the part of the defendant." *Howie v. Walsh*, 168 N.C. App. 694, 698 (2005). The plaintiff must plead facts "from which a layperson could infer negligence by the defendant based on common knowledge and ordinary human experience." *Smith v. Axelbank*, 222 N.C. App. 555, 559 (2012) (citing *Diehl v. Koffer*, 140 N.C. App. 375, 378–79 (2000)). First, this requires that the injury be "of a type that does not ordinarily occur in the absence of some negligent act or omission." *Alston v. Granville Health Sys.*, 221 N.C. App. 416 (2012) (citation omitted), *disc. rev. dismissed*, 336 N.C. 247 (2012). Second, the "instrumentality involved in the accident" must have been "under the defendant's control." *Id.* Last, "the *res ipsa loquitur* doctrine is only applicable where 'there is no direct proof of the cause of the injury available to the plaintiff.'" *Robinson v. Duke Univ. Health Sys., Inc.*, 229 N.C. App. 215, 226 (2013) (quoting *Yorke v. Novant Health, Inc.*, 192 N.C. App. 340, 352 (2008)).

Plaintiffs argue on appeal that the trial court erred in dismissing their claim under the doctrine of *res ipsa loquitur*, arguing that the doctrine continues to apply, as a genuine issue of material fact exists as to whether Mr. Wyer or his agent authorized the DNR order. But plaintiffs offer a flawed analysis of the standard governing application of this doctrine.

Plaintiffs are correct that the placement of an unauthorized DNR order in a patient's medical files, later causing injury or death to the plaintiff due to the defendant's subsequent denial of resuscitative measures, would not ordinarily occur absent negligence, that the patient's medical files were here exclusively within defendant's control, and that an alleged injury of this kind would not have been caused by voluntary actions of the plaintiffs. Indeed, we acknowledged in our previous opinion in this case that no expert evidence was necessary at the pleading stage to establish that such alleged conduct would have constituted negligence in this case, and given that the cause of the allegedly unauthorized DNR placement remained unknown, plaintiffs were able to properly proceed under their *res ipsa loquitur* theory. *Est. of Wyer*, 2022-NCCOA-940 at ¶ 20.

Discovery has occurred in this case, and the record contains Mr. Wyer's medical records detailing precisely how the DNR order came about: NP Mason placed it in Mr. Wyer's files and recorded its contemporaneous authorization by Mr. Wyer and Benita. NP Mason, in her deposition, detailed the standard of care guiding these actions, stating that in North Carolina, a durable and authorized DNR need only be signed "by a physician, nurse practitioner, or physician's assistant," not the patient, as the electronic order is placed in the patient's digital records. NP Mason also testified that a purple DNR band is placed on the patient's wrist. NP Mason detailed her own actions on 14 June 2018: she wrote "as the patient or family is talking" and entered the notes in the medical record "as quickly as I can" using "quotes . . . the

family had said," averring that her consultation notes "truthfully and accurately reflect the conversation and discussion" she had with Mr. Wyer and Benita. She affirmed that she completed the statutory form for the DNR and entered the accompanying DNR order based upon the conversation.

Defendant also produced expert testimony in the form of an affidavit from Randall E. Schisler, Jr. M.D. ("Dr. Schisler"), an internist and palliative care specialist. The opinions expressed therein constitute substantial evidence (1) that NP Mason complied with the applicable standard of care, (2) that the MOST form dated 11 May 2018 was not properly completed and therefore invalid, and (3) that an authorized and properly completed DNR order supersedes the patient's earlier documentation stating his preferences about resuscitative measures, such as the MOST form.

Therefore, discovery made the cause of the alleged injury known in detail to plaintiffs, and defendant has also provided substantial evidence that the conduct in question did not deviate from the standard of care. Accordingly, to proceed on a *res ipsa loquitur* theory, plaintiffs were required to show substantial evidence (1) that a genuine issue of material fact remains as to the DNR's authorized nature, and (2) that a genuine issue of material fact remains as to how it came to be placed in his medical records. Without "more than a scintilla or a permissible inference" sufficient for a "reasonable mind [to] accept as adequate to support [this] conclusion," plaintiffs'

*res ipsa loquitor* claim is insufficient to survive defendant's motion for summary judgment. *Thompson*, 292 N.C. at 414.

Plaintiffs and defendant agree that on 14 June 2018 "[NP] Mason entered a DNR/DNI order in Mr. Wyer's chart." Therefore, there is no genuine issue of material fact as to how the DNR was placed in his records. It is unnecessary to determine here whether a genuine issue of material fact exists as to whether Mr. Wyer authorized the DNR, as this undisputed evidence forecloses plaintiffs' negligence claim insofar as it falls under a *res ipsa loquitur* theory.

### B. Plaintiffs' Medical Malpractice Claim

Although plaintiffs are unable to survive defendant's summary judgment motion on a *res ipsa loquitur* theory, the parties dispute whether substantial evidence establishes genuine issues of material fact as to defendant's liability for negligent medical malpractice. Therefore, we first ask whether defendant has shown the absence of any triable issue because plaintiffs "cannot produce evidence to support an essential element" of this claim. *Collingwood*, 324 N.C. at 66. As discussed above, defendant can show that Mr. Wyer authorized NP Mason's placement of the DNR in his medical file, and that this was in keeping with the applicable standard of care. Plaintiffs must be able to show substantial evidence providing a "forecast of evidence of a genuine issue of material fact" as to all elements of their claim that the unauthorized placement of the DNR in Mr. Wyer's medical files proximately caused

his death. *Rorrer v. Cooke*, 313 N.C. 338, 350 (1985); N.C.G.S. § 1A-1, Rule 56(e) (2013).

### 1. Breach of the Applicable Standard of Care

Plaintiffs argue on appeal that "ample evidence" shows that Mr. Wyer and Benita "clearly expressed a desire for full medical intervention." They cite two forms to this effect, dated 5 April 2018 and 11 May 2018, and the notes recorded by Dr. Sona Patel during the meeting on 13 June 2018. However, Benita admits that the MOST form does not include the name or phone number of the physician who apparently signed it. Plaintiffs' expert witness, RN Latoya Lowery ("RN Lowery"), who was deposed "to explain the difference between a DNR and a MOST form," agreed that these empty spaces render the form incomplete. RN Lowery also affirmed that the MOST form was signed by Benita, rather than Mr. Wyer, and that a Healthcare Power of Attorney takes effect only if the principal is determined to lack sufficient capacity to make or communicate decisions, which was not the case regarding Mr. Wyer. RN Lowery acknowledged that this would make the form legally ineffective.

RN Lowery conceded that she was not qualified to opine on the standards of care applicable to physicians and nurse practitioners, but as a registered nurse, was familiar with and could testify about the validity and implementation of DNR orders and MOST forms. Based upon her reading of Mr. Wyer's medical records, she could not identify therein any deviations from accepted standards of practice or, based on her research, experience, and training, identify anything invalid about the DNR

order. She affirmed that it was properly completed and dated 14 June 2018, and that NP Mason's notes stated that both Mr. Wyer and Benita agreed with the plan.

Benita's Affidavit of Disputed Facts asserts that the "medical record incorrectly reflects that Henry Wyer and I agreed to have a DNR Order placed in his record on June 14, 2018." For supporting evidence, she cites not only to the earlier forms, but to the record of the 13 June meeting with Dr. Patel. However, of these cited materials, only Benita's deposition contains evidence material to the disputed fact as to whether Mr. Wyer authorized the 14 June DNR, which would have superseded Mr. Wyer's earlier directions in either the MOST form or his meeting with Dr. Patel.

Contrary to Dr. Patel's notes and Benita's statement that these notes support her affidavit, Benita claims in her deposition that, on 13 June 2018, Dr. Patel never said that Mr. Wyer had a poor long-term prognosis, and that she was unaware that Dr. Patel had ordered a palliative care meeting the following day. As to the meeting with NP Mason, Benita claims that palliative care was never discussed.

Nevertheless, Benita overwhelmingly corroborates NP Mason's notes of their detailed discussion about Mr. Wyer's multiple diagnoses and care goals, affirming that NP Mason accurately recorded multiple statements made by both Wyers. Benita affirms that NP Mason educated them on hospice services regarding Mr. Wyer's "guarded prognosis with comorbidities and poor functional and nutritional status," and that they discussed "transition to comfort approach with hospice on discharge

where focus will be comfort, quality, and dignity . . . [and] symptom management and preventing rehospitalization" and that "patient and daughter agree with this plan." Benita then contradicts her earlier statement that palliative care was never discussed, claiming that they did discuss the DNR order. Benita denied that she "agree[d] with DNR, DNI, and allowing him to die a natural death" and that NP Mason ever stated that Mr. Wyer's "prognosis was less than six months, if not significantly less."

Benita's Affidavit also states that the DNR was "not properly placed" in Mr. Wyer's medical record. She claims that on 18 June, Mr. Wyer did not have a colored bracelet, and for support, cites her deposition and pictures taken 17 June. The record contains no such photographs, and Benita's deposition makes no reference to the bracelet. But neither can defendant point to any evidence affirming that it placed the bracelet on Mr. Wyer and did not deviate from the standard of care in this regard.

Here, plaintiffs were required to supplement the pleadings "by affidavits or as otherwise provided in this rule [setting] forth specific facts showing that there is a genuine issue for trial." N.C.G.S. § 1A-1, Rule 56(e) (2013). We are obligated to take all facts asserted by plaintiffs as true and view them in the light most favorable to plaintiffs. *Dobson*, 325 N.C. at 83.

Accordingly, on the question of breach, we take as true and view in the light most favorable to Benita's statements that Mr. Wyer did not authorize the DNR and that defendant did not ensure Mr. Wyer wore a DNR bracelet. Benita has personal

experience of the meeting with NP Mason and is therefore presumably competent to give evidence at trial on the narrow question as to what Mr. Wyer communicated on that date regarding the DNR order.

"[W]here matters of the credibility and weight of the evidence exist, summary judgment ordinarily should be denied." *Burrow v. Westinghouse Elec. Corp.,* 88 N.C. App. 347, 351, *disc. review denied,* 322 N.C. 111 (1988). Summary judgment should be denied because the credibility of a witness is to be resolved by the fact finder. *Church v. Mickler,* 55 N.C. App. 724, 732 (1982). The amount of weight and credibility to grant Benita's testimony are for a jury to consider, not this Court. Therefore, on the question of breach, a genuine issue of material fact exists.

### 2. Proximate Causation

"Plaintiffs must be able to make a prima facie case of medical negligence at trial, which includes articulating proximate cause with specific facts couched in terms of probabilities." *Cousart v. Charlotte-Mecklenburg Hosp. Auth.*, 209 N.C. App. 299, 303–304 (2011). Further, "[t]he connection or causation between the negligence and [the injury] must be probable, not merely a remote possibility." *White v. Hunsinger*, 88 N.C. App. 382, 387 (1988). Therefore, the plaintiff must prove it is probable that a different outcome would have occurred if the proper treatment had been rendered, not merely that the patient's chances of survival would have been higher without the alleged deviation in care. *Katy v. Capriola*, 226 N.C. App. 470, 479–80 (2013).

The question of whether CPR would be likely to revive a patient who had asystole, along with several other serious diagnoses and a poor long-term prognosis, implicates "complicated medical questions far removed from the ordinary experience and knowledge of laymen" and is therefore not something a jury can determine without the assistance of expert testimony. *Click v. Pilot Freight Carriers, Inc.*, 300 N.C. 164, 167 (1980). For this reason, "only an expert can give competent opinion evidence as to the cause of the injury" in medical malpractice cases. *Young v. Hickory Bus. Furniture*, 353 N.C. 227, 230 (2000). Without such evidence, summary judgment should be granted for the defendant. *See Cousart*, 209 N.C. App. at 309–10 (summary judgment for defendant affirmed where "no proximate cause evidence submitted by [the plaintiff] was sufficiently reliable to be considered competent").

Through affidavits by Dr. Schisler and James Robinson Harper, Jr. M.D. ("Dr. Harper"), a cardiologist, defendant provides substantial evidence that the DNR order, whether authorized or not, did not proximately cause Mr. Wyer's death. Both doctors are licensed to practice medicine in North Carolina and board certified in their respective fields, and their opinions were based upon their review of Mr. Wyer's medical records and their familiarity with similar cases. Dr. Harper opined that it was unclear what caused Mr. Wyer's heart to stop beating, and that, "to a reasonable degree of medical certainty," CPR would not have revived or resuscitated him. Dr. Schisler concurred "to a reasonable degree of medical certainty, based upon peer reviewed studies published in the medical literature regarding survival after CPR."

As a result of this showing, plaintiffs were required to present evidence in the form of affidavits to forecast a genuine issue of material fact with respect to causation. *Rorrer*, 313 N.C. at 360; N.C.G.S. § 1A-1, Rule 56(e) (2013).

Benita's Affidavit of Disputed Facts makes no claims as to causation, but even if it did, it would be insufficient to create a genuine issue of material fact because she would not be qualified to opine as to the probability that Mr. Wyer would have survived if resuscitative measures were attempted. Plaintiffs' sole expert witness, Ms. Lowery, was deposed on the subject, but Ms. Lowery is not a doctor. Accordingly, she testified that she had no opinion as to why Mr. Wyer died. She also said she did not claim "that any improper care led to the events resulting in his need for resuscitation" or that the nurses "should have ignored the DNR." Further, she said she had "no medical basis to state" how Mr. Wyer would have responded to a resuscitation attempt "in light of his co-morbid health status." In her deposition, Benita affirmed that Mr. Wyer had a range of medical issues at the time of his death, including Paget's disease, partial paralysis, failure to thrive and malnutrition, a UTI, and a bowel obstruction.

Instead of providing or pointing us to the required substantial evidence, plaintiffs argue that defendant's actions created an "evidentiary gap" that "preclude[s] any assessment" of "whether CPR might have succeeded because the hospital unilaterally deprived Mr. Wyer of that opportunity." Therefore, "Defendant

should not be permitted to benefit from the evidentiary uncertainty that its own negligence created."

But this is not the standard. We have no competence to determine whether such evidentiary gap exists, because the record proved sufficient for two licensed physician expert witnesses to evaluate "to a reasonable degree of medical certainty" the issue of proximate cause. We ask instead whether plaintiffs have shown that it is more likely than not that Mr. Wyer would have been revived had defendant administered resuscitative measures rather than complying with the allegedly unauthorized DNR order.

Here, plaintiffs and their expert can offer no evidence showing that Mr. Wyer's death was caused by or resulted from the DNR, instead of Mr. Wyer's extensive physical ailments or some other cause. Accordingly, plaintiffs have not shown any genuine issue of material fact as to causation, an essential element of any negligence claim. Therefore, plaintiffs failed to forecast evidence sufficient to survive defendant's summary judgment motion.

III.    Conclusion

Because plaintiffs lack substantial evidence to support their claim that any negligence by defendant proximately caused Mr. Wyer's death, defendant is entitled to judgment as a matter of law and the trial court properly entered summary judgment in its favor.

AFFIRMED.

Judges ZACHARY and WOOD concur.

Report per Rule 30(e).